UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRIAN SANCHEZ,

Plaintiff,

v.

STATE OF WASHINGTON et al.,

Defendants.

CASE NO. 2:23-cv-01994-LK

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

Defendants State of Washington, Washington State Department of Corrections ("DOC"), Correctional Unit Supervisor Susan Collins, Correctional Officer Oscar Gomez, Correctional Officer Bo Smokoska, Correctional Officer Jonathan Stitz, Dr. Valerie Weber, Dr. Aidan Tro, and DOC Twin Rivers Unit Facility Medical Director Areig Awad move for summary judgment on all of Plaintiff Brian Sanchez's claims. Dkt. No. 34 at 1–2. For the reasons explained below, the Court grants the motion in part and denies it in part.[1]

---

[1] Because the Court can decide the matter based on the parties' briefing, it denies Defendants' request for oral argument. *Id.* at 1.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 1

## I.    BACKGROUND

After being sentenced in October 2018 to 102 months of imprisonment for first degree burglary, Plaintiff Brian Sanchez was housed in the Twin Rivers Unit at the Monroe Correctional Complex ("MCC") in Snohomish County, Washington from November 2018 to September 2022. Dkt. No. 44 at 190–91.

### A.    Sanchez Sustains Injuries After Ingesting Spice

Sanchez was injured during an incident that occurred on November 1, 2021, while he was incarcerated at MCC. On that date at approximately 12:45 p.m., a correctional officer performing tier checks in the prison called a medical emergency to Sanchez's second-story cell because Sanchez and his cellmate were "out of it and unresponsive to staff directives." Dkt. No. 44 at 133 (quotation marks omitted).

#### 1.    Jail Staff and Medical Personnel's Version of Events

Correctional officers Gomez and Michael Nuño arrived first. Dkt. No. 40 at 5; Dkt. No. 44 at 27. The officers gave "multiple directives through the cell window" (in both English and Spanish), and during the directives, Sanchez's "speech was slurred," his eyes "were not focusing on any of the staff members who were giving the directives," and he initially did not comply with the directives. Dkt. No. 40 at 5; *see also* Dkt. No. 44 at 27. This behavior led officers to suspect that he was under the influence of an illicit substance. Dkt. No. 40 at 5; *see also* Dkt. No. 44 at 46.

Officers then opened the door to the cell and Officers Nuño and Gomez handcuffed Sanchez[2] and held him on either side while they "assisted" him (with each officer having one hand on Sanchez's shoulder and one hand on his elbow)[3] to the adjacent wall "to keep him from falling

---

[2] Sanchez recalls that his hands were cuffed in front of him, while Officer Gomez and an attending nurse recall that his hands were cuffed behind him. Dkt. No. 44 at 21, 28, 36–37, 222.

[3] Sanchez describes this as "the proper escort technique." Dkt. No. 46 at 2.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 2

and injuring himself." Dkt. No. 40 at 5; *see also* Dkt. No. 44 at 27–30. Nuño and Gomez directed Sanchez to turn to the right, but he instead moved in the opposite direction, "lung[ing] forward" toward the four-foot-high railing surrounding the second floor. Dkt. No. 44 at 28; *see also id.* at 45 (Nuño testifying that Sanchez was "moving around so unpredictabl[y]" and officers were concerned that he would fall over the railing); Dkt. No. 37 at 2 (Collins averring that Sanchez was "moving erratically and lunged toward the second story railing"). The officers "pulled him back" and directed him to turn towards the shower area where medical staff would have space to examine him, at which point "he made [a] sudden move to pull away from [officers]." Dkt. No. 44 at 28–29. During this effort, Sanchez made "sporadic movements of both his arms and legs" and spoke "a mixture of both Spanish and English dialogue that was unrecognizable[.]" Dkt. No. 40 at 5.

Sanchez then made a sudden movement and "landed face first" on the ground. Dkt. No. 44 at 29; *see also* Dkt. No. 37 at 2. The Officers tried to slow his fall, and Officer Gomez fell to one knee in the effort. Dkt. No. 44 at 29, 36. Officers Nuño and Gomez then rolled Sanchez over in an attempt to "get him in a seated position on the floor" while medical staff attempted to assess him. *Id.* at 30. Sanchez tried to move away from the officers, and "his eyes ke[pt] rolling back" in a manner that made Officer Gomez believe that "his mind [was] altered" to such a degree that he may not have been "controlling his own movements." *Id.* at 31. The officers prevented Sanchez from continuing his erratic movements to facilitate his medical assessment. *Id.* at 30–31, 51. Around that time, Officer Stitz arrived and assisted Nuño and Gomez by holding Sanchez's legs down. Sanchez "was kicking literally and sprawling all over the place." *Id.* at 51.

While he was on the ground, Sanchez was "talking nonsense," thrusting his hips forward and telling the nearby correctional unit supervisor and nurse to "come with [him]" and that he would "fuck [them] so hard." *Id.* at 32–33, 37; *id.* at 51–52 (Stitz testifying that Sanchez "started making sexual commends towards the [Custody Unit Supervisor]" while "gyrating . . . his hips"

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 3

and then called Stitz "a whole bunch of inappropriate things, like fat whale"); *id.* at 17–18 (Sanchez testimony).

Medical staff arrived as Sanchez was "yelling, screaming, talking in a different language, very agitated, strong, writhing on the floor with intermittent seizure-like clonic activity and eyes rolling upward, with up to 5-6 officers holding him, arms cuffed behind his back." *Id.* at 222. Initially, medical staff was "[u]nable to get full vital signs due to [Sanchez's] violent movements." *Id.* When they did obtain his vitals, his oxygen was 86 percent, which was improved to 96 percent after he was administered oxygen. 911 was called. *Id.* At some point during these events, Sanchez chipped his two front teeth and sustained a cut to his lip. *Id.* at 19–20, 31, 42.

Medical staff then administered an injection to Sanchez's shoulder to calm him, which took effect "after about 5 minutes." *Id.* at 222. He was positioned by staff on his side in the "recovery position," where he threw up "a red Kool-Aid-looking mixture." Dkt. No. 50 at 19–20; Dkt. No. 44 at 222 (reporting that Sanchez "vomit[ed] red colored semi-undigested food, did not appear as blood"). Around that time, a member of the medical staff stated that Sanchez was having a seizure. Dkt. No. 50 at 20. Medics responding to the 911 call then arrived, and after several minutes, they were able to walk Sanchez "down the stairs to the lower tier, one on each side of him," where he was escorted to their gurney and taken to the hospital. Dkt. No. 44 at 222. Defendant Smokoska escorted Sanchez's transport to the hospital pursuant to Medical Director Awad's authorization. *Id.* at 133; Dkt. No. 36 at 2, 6.

At the hospital, Sanchez "admit[ted] using spice" and "afterwards he ha[d] no idea what happened." Dkt. No. 44 at 101. He was diagnosed with "spice ingestion" and "seizure activity." *Id.* at 105.[4]

---

[4] Spice is a "synthetic form of marijuana." *United States v. Aquino*, 794 F.3d 1033, 1035 (9th Cir. 2015). According

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 4

2.  Sanchez's Version of Events

Sanchez has consistently stated—including during the hospital visit on November 1, 2021 and at his deposition during the course of this litigation—that he has little or no memory of the incident. *See, e.g.*, Dkt. No. 44 at 16, 18, 21, 82, 89, 101, 107, 220. As discussed above, he stated at the hospital that after ingesting spice, he "ha[d] no idea what happened." *Id.* at 101. In April 2022, a Psychiatric Progress Note records Sanchez as saying, "I don't recall anything except them being on the top of me" and "I do not recall this day." *Id.* at 89. A neurologist's progress note from May 5, 2022 states that Sanchez "offers limited recollections other than medics standing over him and he was taken to the [hospital]." *Id.* at 107. When interviewed on May 12, 2022 regarding his allegations of excessive force, Sanchez stated that he "[doesn't] remember everything from this incident" and "drew [his] conclusion by what [he was] told by others." *Id.* at 220. And in July 2022, a Psychiatric Progress Note reports that Sanchez "has no recall of the seizure in November 2021." *Id.* at 82.

Despite this, Sanchez retells the events of November 1, 2021 differently. In his declaration, he states that he took "five or six steps" out of his cell when he was "suddenly grabbed and taken to the ground," at which point he lost consciousness. Dkt. No. 47 at 2. When he came to, he "heard Officer Gomez tell another officer to take his or her knee off my chest." *Id.* Then "several officers lift[ed] [him] off the ground, plac[ed] [him] on a stretcher, and then t[ook] [him] downstairs." *Id.*

In Sanchez's deposition, he told another version of events. He stated that he was trying to get back to his cell after exiting it by "scooting sideways" slowly. Dkt. No. 44 at 15. Although he "do[es]n't really, like, remember," he "got slammed" and "just remember[s], like, all of these

to the U.S. Drug Enforcement Agency, adverse effects of spice include "tachycardia (elevated heart rate), elevated blood pressure, unconsciousness, tremors, seizures, vomiting, hallucinations, agitation, anxiety, pallor, numbness, and tingling." DEA, Spice/K2 Synthetic Marihuana, https://www.dea.gov/factsheets/spice-k2-synthetic-marijuana (visited Feb. 18, 2026); *see also United States v. Matlock*, No. 21-CR-40028-JPG, 2024 WL 3741439, at *2 n.6 (S.D. Ill. Aug. 9, 2024).

officers on top of [him,] telling [him] to . . . like, to stop resisting." *Id.* at 16. He also characterizes his journey to the floor as a "fall": "[W]hen I first fell down, like, I fell face first. Like, I landed first, like, on my chest. Like, I fell down, like, forward." *Id.* at 20. After the fall, Sanchez says that he tried to "pull [his] hands to, like, touch [his] face . . . because . . . [he] felt like something happened to [his] mouth" but "Nuño or [Smokoska] pulled [his] wrists down." *Id.*[5] A "paramedic or nurse was like, 'He's having a seizure[.]'" *Id.* at 17. When he received the shot to his shoulder, "[i]t was, like, as if [he] woke up," and his "legs [were] tied up" and Officer Gomez was on his legs. *Id*. He started cussing at Gomez and "called him a whale" and "cussing at the [Custody Unit Supervisor]" because "she didn't, like, help me, and he "told her, like, 'I love you' and stuff." *Id.* at 17–18. At that point he was "in and out of it" and "passed out again" and then went into a "van or . . . ambulance" but does not remember "getting, like, the CT scan or, like, talking to the doctor inside the hospital," and does not "even remember the transportation ride back to the prison." *Id.* at 18.

**B.      The Aftermath**

Sanchez returned to MCC from the hospital on the same day of the incident, November 1, 2021. *Id.* at 78. He was placed in restrictive housing, where a nurse assessment noted that he had two broken teeth and complained of his fingers being numb on his right hand. *Id.* The assessment further noted "possible spice use that may have caused seizures." *Id.* at 79. Sanchez avers that he realized that his front teeth were "chipped off" and his mouth was cut after sleeping in his cell for a couple of hours upon returning from the hospital. Dkt. No. 47 at 2.

The next morning, on November 2, 2021, Dr. Weber performed a dental limited examination and determined that two of Sanchez's teeth would need a root canal and crowns. Dkt.

---

[5] Again, no witness other than Sanchez states that his wrists were cuffed in front of his body.

No. 43 at 15. Dr. Weber placed a temporary filling on the teeth and advised Sanchez that he would need to get permanent crowns after release since the offender health care program did not cover them. *Id.* at 2–3, 15.

On November 3, 2021, investigators searched Sanchez's cell and found "an altered toilet paper roll commonly used as a smoking item, multiple burnt pieces of paper, altered teabags, and burnt strips of foil," all paraphernalia commonly associated with the narcotic "spice." Dkt. No. 44 at 200.

On November 10, 2021, Sanchez submitted a grievance stating as follows:

> I had a seizure and was mistreated during it. I got slammed and piled up on top by D.O.C. Staff. I was in and out so I can't name the [Correctional Officers]. . . . I got my 2 front teeth smashed in half and my right hand has been numb for over a week due to them mistreating me during my seisure. They put me in the hole because they think drugs was the cause of my seizure. There was no drugs in my system or cell. I have history of seizures and my family too. I'm being punished for no reason.

Dkt. No. 47 at 2, 5.

At some point after Sanchez returned to prison from receiving treatment at the hospital, he apologized to Officers Gomez and Stitz for his behavior. Dkt. No. 44 at 34–35, 53.

Sanchez's broken teeth ultimately required four root canals over several months. Dkt. No. 43 at 2, 15; *see also id.* at 7, 9, 11, 13, 17, 19, 21, 23; *see also* Dkt. No. 42 at 2 (Dr. Tro stating that "[r]oot canals typically require multiple appointments."); Dkt. No. 47 at 3. In his declaration, Sanchez attests that the November 1, 2021 incident "caused [him] constant physical pain such as headaches, bruised ribs, wrist numbness, carpel [sic] tunnel, scratches on [his] ankles, and tooth aches," as well as "difficulty concentrating, sleeping, and remembering," "recurring bouts of sadness[,] and near perpetual periods of anxiety[.]" Dkt. No. 47 at 3.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 7

**C.      The Lawsuit**

Sanchez initiated this action in state court in November 2023. Dkt. No. 1-1. Defendants timely removed the case to federal court in December 2023. Dkt. No. 1. Sanchez's complaint advances six claims that are grouped within four "causes of action": (1) assault, battery, and outrage against Officers Gomez, Smokoska, and Stitz based on their use of force against him; (2) negligence against all Defendants based on their failure to adequately provide for his health and welfare; (3) medical negligence against Dr. Weber, Dr. Tro, and Medical Director Awad for failing to provide adequate treatment for his tooth pain and right hand numbness; and (4) deliberate indifference under the Eighth Amendment pursuant to 42 U.S.C. § 1983 against Dr. Weber, Dr. Tro, and Medical Director Awad based on their "deliberate indifference to [Sanchez's] serious medical and dental needs[.]" Dkt. No. 1-1 at 8–11. For these alleged violations, he seeks damages, costs, and attorney's fees. *Id.* at 12.

**D.      Defendants' Summary Judgment Motion and Sanchez's Counsel's Failure to Respond to Conferral Request**

Following the completion of discovery, Defendants filed the pending motion for summary judgment on all of Sanchez's claims. Dkt. No. 34. Defendants attempted, without success, to meet and confer prior to filing this motion in compliance with Section V.G of the Court's Standing Order for all Civil Cases. *Id.* at 1–2 (stating that Defendants' counsel emailed Sanchez's counsel seeking to confer regarding the motion several weeks in advance of filing it, but never received a response). In failing to respond to Defendants' counsel, Sanchez's counsel's conduct falls well below that expected in this District. "The judges of this district expect a high degree of professionalism from the lawyers practicing before them," including cooperation in complying with each judge's chambers procedures. Introduction to the Local Civil Rules. Here, a meet and confer could have greatly simplified the issues before the Court, as indicated below.

## II.  DISCUSSION

### A.  Jurisdiction

This Court has subject matter jurisdiction over Sanchez's Section 1983 claim pursuant to 28 U.S.C. § 1331, and it has supplemental jurisdiction over his state law claims because they arise from the same underlying facts as the federal claim. *See* 28 U.S.C. § 1367(a); *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) ("A state law claim is part of the same case or controversy when it shares a common nucleus of operative fact with the federal claims and the state and federal claims would normally be tried together." (citation modified)).

### B.  Scope of the Record

In their summary judgment briefing, Defendants partially rely on the report of Mario Paparozzi, PhD, in which he opines that, among other things, (1) it was reasonable for correctional officers to assume that Sanchez was under the influence of an illicit substance when they encountered him in his cell on November 1, 2021; (2) any injuries Sanchez sustained that day were not caused by anything correctional staff did or failed to do; (3) correctional staff were not "seeking a pathway to use of force" that day, and in fact no use of force was used against Sanchez on that day. Dkt. No. 34 at 15, 21 (quoting Dkt. No. 35 at 8–9, 14–15). For the first time in his opposition brief, Sanchez argues that the Court should exclude Paparozzi's testimony. Dkt. No. 46 at 6–10. This argument is improper for a number of reasons.

First and foremost, motions challenging expert witness testimony were due on December 6, 2024. Dkt. No. 29 at 2. Sanchez's December 26, 2024 request to exclude Paparozzi—for which he did not seek an extension of time or show good cause or excusable neglect, *see* Fed. R. Civ. P. 6(b)(1)(B), 16(b)(4)—is untimely. "The truth-seeking function of litigation is best served by an orderly progression, and because *Daubert* generally contemplates a 'gatekeeping' function, not a 'gotcha' [f]unction," a district court may "reject as untimely *Daubert* motions raised late in the

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 9

trial process." *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087 (10th Cir. 2001); *see also Feliciano-Hill v. Principi*, 439 F.3d 18, 24 (1st Cir. 2006) ("Parties have an obligation to object to an expert's testimony in a timely fashion," and where a party "did not make a timely motion" and did not "offer[] any reason for her delay," the district court was "on firm ground in refusing her motion as untimely.").[6]

Second, "[r]equests for affirmative relief must be made in a motion, not in the response[.]" *Sergeant v. Bank of Am., N.A.*, No. C17-5232-BHS, 2018 WL 1427345, at *1 n.2 (W.D. Wash. Mar. 22, 2018) (citation modified); *see also* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."); *Meghinasso v. Mercedes-Benz USA*, No. C17-5930-LK, 2022 WL 226078, at *1 (W.D. Wash. Jan. 26, 2022) ("[I]t is procedurally improper to include a request for affirmative relief in a response brief[.]").

For these reasons, the Court denies Sanchez's *Daubert* request as untimely and procedurally improper. However, the Court's ruling on Defendants' motion for summary judgment would be the same whether or not the Court considered the Paparozzi report.

## C.    Legal Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. While "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the

---

[6] Expert reports were due by July 15, 2024, Dkt. No. 15 at 1, and Paparozzi's report is dated July 11, 2024, Dkt. No. 35 at 16. Sanchez does not contend that he received the report late or otherwise lacked an opportunity to file a timely *Daubert* motion.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 10

summary judgment motion," *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation modified), this is true "only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Scott*, 550 U.S. at 380 ("[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." (quoting Fed. R. Civ. P. 56(c)).

The Court will, however, enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has carried its burden under Rule 56, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation modified). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, nonspecific allegations, *Lujan*, 497 U.S. at 888–89.

### 1. Claims against Medical Care Defendants

#### (a) The Court Grants Summary Judgment in Favor of the Medical Care Defendants on Sanchez's Medical Negligence Claim

Defendants argue that Sanchez's medical negligence claim against Dr. Weber, Dr. Tro, and Medical Director Awad (the "Medical Care Defendants") fails because he has no evidence to establish the standard of care or breach thereof, and regardless, DOC personnel met the standard of care. Dkt. No. 34 at 22–23.

To defeat summary judgment on his medical negligence claim, Sanchez must establish a genuine issue of material fact on two key elements: "(1) that the defendant health care provider failed to exercise the standard of care of a reasonably prudent health care provider in that same

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 11

profession and (2) that such failure was a proximate cause of the plaintiff's injuries." *Frausto v. Yakima HMA, LLC*, 393 P.3d 776, 779 (Wash. 2017) (citing Wash. Rev. Code. § 7.70.040). Under Washington law, "[i]f a plaintiff lacks competent expert testimony to create a genuine issue of material fact with regard to one of the elements of the [medical negligence] claim and is unable to rely on an exception to the expert witness testimony requirement, a defendant is entitled to summary judgment." *Reyes v. Yakima Health Dist.*, 419 P.3d 819, 823 (Wash. 2018) (en banc).

As Defendants point out, Sanchez "has disclosed no expert witness to support a claim of medical negligence[.]" Dkt. No. 34 at 2. Sanchez opposes none of Defendants' arguments; instead, in his response brief, he states that although he "alleged dental malpractice in the subsequent treatment and care of his teeth, he has abandoned that claim and is proceeding solely on the subject incident in which he was injured" such that the "remaining claims can be dismissed." Dkt. No. 46 at 1–2; *see also id.* at 5 ("Plaintiff concedes that he does not have sufficient evidence to prove either medical or dental malpractice."). The Court grants summary judgment to Defendants on Sanchez's medical negligence claim.

*(b) The Court Grants Summary Judgment in Favor of the Medical Care Defendants on Sanchez's Eighth Amendment Deliberate Indifference Claim*

Defendants argue that Sanchez's Eighth Amendment deliberate indifference claim against the Medical Care Defendants fails because none of those Defendants disregarded an excessive risk to Sanchez's health or safety. Dkt. No. 34 at 25–27.

In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). "This includes both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quotation marks

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 12

omitted). "A determination of 'deliberate indifference' involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *Balla v. Idaho*, 29 F.4th 1019, 1026 (9th Cir. 2022) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992)); *see also Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (deliberate indifference requires "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference"). "A prison official is deliberately indifferent under the subjective element of the test only if the official knows of and disregards an excessive risk to inmate health and safety." *Colwell*, 763 F.3d at 1066 (quotation marks omitted). This requires more than an ordinary lack of due care; the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quotation marks omitted).

Defendants submit evidence that Director Awad's limited participation in the events at issue did not put Sanchez at risk of substantial harm or put Awad on notice of such risk. Dkt. No. 34 at 25; Dkt. No. 36 at 2–3 (Awad declaration). Defendants also submit evidence that—far from exhibiting deliberate indifference to Sanchez's medical needs—the care that Dr. Tro and Dr. Weber provided to Sanchez was medically appropriate. Dkt. No. 34 at 25–27; Dkt. No. 42 at 2–3 (Tro declaration); Dkt. No. 43 at 2–4 (Weber declaration). As with his medical negligence claim, Sanchez opposes none of Defendants' arguments with respect to his deliberate indifference claim; instead, in his response brief, he states that the claim "can be dismissed[.]" Dkt. No. 46 at 1–2. However, the Court cannot assume that the claim lacks merit based on a failure to respond on summary judgment. LCR 7(b)(2). Based on the unrebutted evidence in the record, the Court grants summary judgment to Defendants on Sanchez's Eighth Amendment deliberate indifference claim. *Matsushita*, 475 U.S. at 587.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 13

2.  Claims Against Defendant Officers

Defendants argue that Sanchez's claims of assault, battery, and outrage against Correctional Officers Gomez, Smokoska, and Stitz (the "Defendant Officers") fail because (1) Sanchez "offers no evidence of any intent to cause harm," (2) the officers are entitled to qualified immunity, and (3) Sanchez "was unsure at deposition of Officer Smokoska's involvement, admittedly confusing him with another officer." Dkt. No. 34 at 2. Defendants also contend that summary judgment is merited on Sanchez's negligence claim against Defendant Officers because they did not breach the standard of care. *Id.* And finally, Defendants assert that Sanchez's claims against Correctional Unit Supervisor Collins fail because, like with Officer Smokoska, Sanchez cannot establish her personal involvement in any of his claims. *Id.* at 2, 19.

*(a)  The Court Grants Summary Judgment in Favor of Collins and Smokoska*

Defendants have submitted evidence that Supervisor Collins and Officer Smokoska were not involved in any of the alleged actions encompassed in Sanchez's causes of action. Collins states that she "was about 20 feet away on the other side of the tier" from Sanchez on the day of the events in question and heard him "screaming weird things" at her, but "did not otherwise participate in the events of November 1, 2021 as they concern Brian Sanchez." Dkt. No. 37 at 2. Officer Smokoska attests that "[o]n November 1, 2021, [he] escorted [Sanchez's] transport to the hospital," and "did not put hands on or touch Brian Sanchez that day, other than perhaps adjusting his medical restraints at the request of medical." Dkt. No. 41 at 2. He "did not otherwise interact with Brian Sanchez on November 1, 2021." *Id.*

Sanchez fails to rebut this evidence; indeed, he does not respond to it at all. *See generally* Dkt. No. 46. Based on the unrebutted evidence in the record, the Court grants summary judgment to Supervisor Collins and Officer Smokoska on Sanchez's claims against them. *Matsushita*, 475 U.S. at 587.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 14

  *(b) The Court Grants Summary Judgment to the Remaining Officer Defendants on Sanchez's Assault Claim*

Defendants argue that they are entitled to summary judgment on Sanchez's assault claim because he fails to show any apprehension of a battery. Dkt. No. 34 at 18. In opposition, Sanchez purports to respond to Defendants' arguments regarding his assault and battery claims, Dkt. No. 46 at 15, but instead only discusses negligent infliction of emotional distress, *id.* at 15–16. Sanchez thus fails to respond to Defendants' arguments regarding his assault claim.

  "An assault is any act of such a nature that causes apprehension of a battery." *McKinney v. City of Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App. 2000). Here, Sanchez points to no evidence that Defendants' actions caused him apprehension of a battery. *See Allen v. Hannaford*, 244 P. 700, 701 (Wash. 1926) (whether an assault has occurred depends on "the apprehensions created in the mind of the person assaulted"). Indeed, in his own declaration, he states that he "was suddenly grabbed and taken to the ground." Dkt. No. 47 at 2. He does not assert that he had any apprehension of a battery in that time. *See generally id.* Accordingly, the Court grants summary judgment to the remaining Officer Defendants on Sanchez's assault claim.

  *(c) The Court Grants Summary Judgment to Officer Stitz on Sanchez's remaining claims*

Sanchez's remaining claims are outrage, battery, and negligence against the DOC, Officer Gomez, and Officer Stitz. Defendants argue that they are entitled to summary judgment on Sanchez's battery and outrage claims because "he lacks any competent evidence of intentionality to cause harm." Dkt. No. 34 at 17; *see also id.* at 18 (Sanchez "cannot show that any person involved intended to harm him"). According to Defendants, Sanchez's "own testimony is that no one hit him; he *fell*," and after he fell, Officer Stitz assisted with the application of leg restraints for Sanchez's safety. *Id.* at 18. Defendants assert that Sanchez's negligence claim also fails because DOC and its officers "neither breached [their] duty to [Sanchez] nor caused his injuries." *Id.* at 21.

Instead, "[c]ustody officers quickly responded to [Sanchez's] medical emergency, acted to ensure the safety of themselves, other inmates, and [Sanchez,]" and "did what they could to mitigate the harms that [Sanchez] was causing himself." *Id.*

"The basic elements of the tort of outrage are: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Dicomes v. State*, 782 P.2d 1002, 1012 (Wash. 1989) (quotation marks omitted). "[M]ere negligence is not enough," nor is it sufficient that the "defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort"; "[l]iability exists only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975) (citation modified); *see also Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003) (same). And while "[t]he question of whether certain conduct is sufficiently outrageous is ordinarily for the jury," the court must initially "determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Dicomes*, 782 P.2d at 1013. In making this determination, a court must consider the following factors: (1) the position occupied by the defendant; (2) whether the plaintiff was peculiarly susceptible to emotional distress, and if the defendant knew this fact; (3) whether the defendant's conduct may have been privileged under the circumstances; (4) the degree of emotional distress caused by the defendant and whether it was severe as opposed to mere annoyance, inconvenience or the embarrassment which may normally occur in a confrontation of the parties; and (5) whether the defendant was aware that there was a high probability that his conduct would cause severe emotional distress and whether he proceeded in a conscious disregard

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 16

of that likelihood. *Birklid v. Boeing Co.*, 904 P.2d 278, 286 (Wash. 1995) (citation omitted). With respect to his outrage claim, Sanchez argues that "[i]f the jury credits Sanchez's evidence, it could find that the defendants' slamming him to the ground is extreme and outrageous conduct for the purposes of causing him severe emotional distress." Dkt. No. 46 at 12.

A person commits a battery "where he or she performs an act which, directly or indirectly, is the legal cause of a harmful contact with another's person and that act is intentional, is not consented to, and is otherwise unprivileged." *Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 205 (Wash. 2014) (citation modified). "[T]he 'intent' element of battery is satisfied where a defendant knows to a 'substantial certainty' that his actions will result in the harmful or offensive touching." *Id.* (quoting *Garratt v. Dailey*, 279 P.2d 1091, 1094 (Wash. 1955). "A bodily contact is offensive if it offends a reasonable sense of personal dignity." *Sutton v. Tacoma Sch. Dist. No. 10*, 324 P.3d 763, 766 (Wash. Ct. App. 2014) (quoting Restatement (Second) of Torts § 19 (1965)). Sanchez does not respond to Defendants' arguments regarding his battery claim. As discussed above, in the section of Sanchez's opposition brief purporting to respond to Defendants' arguments about his battery claim, he instead discusses a new theory of negligent infliction of emotional distress. Dkt. No. 46 at 15–16.

"In order to recover on a common law claim of negligence, a plaintiff 'must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury.'" *Lowman v. Wilbur*, 309 P.3d 387, 389 (Wash. 2013) (quoting *Crowe v. Gaston*, 951 P.2d 1118, 1120 (Wash. 1998)). With respect to his negligence claim, Sanchez asserts that DOC and its agents and employees were "responsible for making sure Sanchez [wa]s not allowed to injure himself, which includes not allowing his face to strike the ground while corrections staff [we]re physically escorting him." Dkt. No. 46 at 13. According to

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 17

Sanchez, "DOC breached that duty . . . by allowing him to slam his face into the ground, breaking his front teeth." *Id.* at 14.

Sanchez does not remotely offer any evidence that Officer Stitz intentionally or recklessly caused him emotional distress or an offensive contact, or that Stitz was negligent in any respect. As discussed above, his outrage claim is premised upon officers "slamming him to the ground . . . for the purposes of causing him severe emotional distress," and his negligence theory is similarly premised upon officers "allowing him to slam his face into the ground, breaking his front teeth." *Id.* at 12, 14. It is undisputed that the only Defendant Officer who was possibly involved in that alleged action was Gomez, not Stitz. *See id.* at 2–3 (Sanchez's opposition brief stating that "Officers Gomez and Nuño" used "the proper escort technique" to escort him on either side of his person and then "both officers took Sanchez to the ground[.]"); Dkt. No. 34 at 6 (Defendant's motion for summary judgment asserting that Nuño and Gomez had control of Sanchez at the time he "jerked unexpectedly forward" and fell). Defendants have submitted evidence that, far from intending Sanchez any harm or offensive contact or breaching any duty to him, Officer Stitz "assisted with responding to . . . Sanchez and his apparent overdose, specifically his legs, to prevent him from hurting himself with his thrashing and to enable medical staff to assess him." Dkt. No. 39 at 2. Sanchez does not rebut this evidence or cite to any evidence regarding Officer Stitz's alleged negligence or intentional or reckless infliction of emotional distress. The Court has no obligation to scour the record for evidence that might support his position. *See Murthy v. Missouri*, 603 U.S. 43, 67 n.11 (2024) ("[J]udges are not like pigs, hunting for truffles buried in the record," and cannot manufacture arguments for a litigant (citation modified)). Accordingly, the Court grants summary judgment to Officer Stitz on Sanchez's outrage, battery, and negligence claims.

The Court now turns to the remaining claims against the DOC and Officer Gomez.[7]

### (d) Battery, Outrage, and Negligence Claims Against the DOC and Officer Gomez

#### (i) The Court Grants Summary Judgment to the DOC and Officer Gomez on Sanchez's Outrage and Battery Claims

For reasons similar to those discussed above with respect to Officer Stitz, the Court also grants summary judgment to Officer Gomez on Sanchez's outrage claim. Again, it is not sufficient for a plaintiff to show that the "defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort"; "[l]iability exists only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimsby*, 530 P.2d at 295 (citation modified). Sanchez "has done little to explain how the conduct here satisfies the high standard for an outrage claim—relegating" the issue to a few sentences in his opposition that do not cite to the record at all (in violation of the Local Civil Rules). *Dean v. City of Tacoma*, No. C21-5822 MJP, 2025 WL 1159074, at *9 (W.D. Wash. Apr. 21, 2025); Dkt. No. 46 at 12–13.[8] "The Court has not been provided with sufficient argument and evidence to identify how the conduct at issue here goes 'beyond all possible bounds of decency, and to be regarded as atrocious.'" *Dean*, 2025 WL 1159074, at *9 (citation modified). And even if there were such evidence, Sanchez has failed to provide evidence cited that shows that Officer Gomez acted

---

[7] As noted above, for the first time in his response brief, Sanchez raises negligent infliction of emotional distress. Dkt. No. 46 at 15–16. A plaintiff "may not effectively amend [his] Complaint by raising a new theory . . . in [his] response to a motion for summary judgment." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–93 (9th Cir. 2000) (plaintiffs "cannot turn around and surprise the [defendant] at the summary judgment stage" with a new theory of liability). The Court accordingly does not consider these arguments.

[8] The Court does not consider Sanchez's factual assertions that are unsupported by any citations to the record in violation of the Local Civil Rules. *See, e.g.*, Dkt. No. 46 at 12–13.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 19

intentionally or recklessly to cause him emotional distress. *See id.* (granting summary judgment in defendants' favor on plaintiff's outrage claim where plaintiff failed to produce sufficient argument or evidence of outrageousness or intentional or reckless infliction of emotional distress). For these reasons, the Court grants summary judgment to Officer Gomez and the DOC on Sanchez's outrage claim.

With respect to Sanchez's battery claim against Officer Gomez, it is undisputed that at least some of Gomez's contact with Sanchez was privileged. Dkt. No. 46 at 2–3; Dkt. No. 34 at 6. And Defendants have submitted evidence that during the incident in question, Gomez acted with the intent to slow Sanchez's descent, not to cause him an offensive contact. Dkt. No. 44 at 29, 36. Again, Sanchez fails to respond to Defendants' arguments with respect to his battery claim, and makes no attempt to rebut Defendants' evidence that Gomez's individual actions were not made with the intent or knowledge that they would result in offensive touching. Absent any effort by Sanchez to respond to Defendants' arguments, the Court has no obligation to create arguments or identify evidence for him; to do so would depart from the Court's role of simply "call[ing] balls and strikes" without "get[ting] a turn at bat." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (citation modified); *see also Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("Our adversarial system relies on the advocates to inform the discussion and raise the issues to the court."). It is antithetical to our adversarial system for a Court to do the work for a litigant who has refused to put in the effort himself. Accordingly, the Court grants summary judgment to Officer Gomez and the DOC on Sanchez's battery claim.

> *(ii)* Gomez and the DOC are not Entitled to Summary Judgment on Sanchez's Negligence Claim

In addition to arguing that Officer Gomez "neither breached [his] duty to [Sanchez] nor caused his injuries," Dkt. No. 34 at 21, Defendants assert that Officer Gomez is entitled to qualified

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 20

immunity on Sanchez's negligence claim because he was "performing [his] assigned and statutory job functions of ensuring inmate safety and health," "acted to diminish the risks to [Sanchez] and get him medical care," and acted reasonably in intervening given the circumstances presented. *Id.* at 19 (citing Wash. Rev. Code § 43.101.010 (2015); Wash. Rev. Code § 72.10.[9]

Sanchez does not respond to Defendants' arguments regarding qualified immunity, *see generally* Dkt. No. 46, but as discussed above, with respect to his negligence claim, Sanchez responds that DOC and its agents breached their duty of "making sure Sanchez [wa]s not allowed to injure himself" by "allowing him to slam his face into the ground, breaking his front teeth." *Id.* at 13, 15.

"[J]ailers have a special relationship with inmates, creating an affirmative duty to provide for inmate health, welfare, and safety." *Gregoire v. City of Oak Harbor*, 244 P.3d 924, 929 (Wash. 2010) (en banc); *see also Matter of Williams*, 496 P.3d 289, 299 (Wash. 2021). This affirmative duty to protect inmates from harm "includes protection from self-inflicted harm[.]" *Gregoire*, 244 P.3d at 931. In a negligence action, an officer is entitled to qualified immunity when the officer (1) carries out a statutory duty (2) according to procedures dictated to him by statute and superiors, and (3) acts reasonably. *Staats v. Brown*, 991 P.2d 615, 627 (Wash. 2000); *see also id.* (explaining that "state immunity . . . and the qualified immunity available under . . . § 1983" are different: "the three-part test set out by [state law] is not the standard used in § 1983 actions which is based upon whether or not the constitutional right allegedly violated was clearly established at the time"); *see also* Wash. Rev. Code § 9A.16.020(1) (providing that use of force is not unlawful "[w]henever necessarily used by a public officer in the performance of a legal duty").

---

[9] Defendants also argue that "where there is more than one potential cause of harm, expert witnesses are necessary to avoid speculation," and here, Sanchez's attribution of problems with his right wrist to the incident on November 1, 2021 is "nothing more than speculation," especially given that Sanchez "has a history of right wrist injuries[.]" Dkt. No. 34 at 21. As discussed below, the only theory of negligence that Sanchez asserts in response relates to his mouth injuries; any other theory has been abandoned. Therefore, this argument is moot.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 21

Sanchez has produced testimony from witnesses that his teeth were broken because Officer Gomez and another officer "slammed" him to the ground. Specifically, Sanchez's fellow inmate Benny Lozano Rodriguez testifies that the officers told Sanchez to stop resisting and "then slammed Sanchez on the floor," where "[h]is face made an impact with the ground" and where Lozano Rodriguez observed "remains of Sanchez's broken teeth[.]" Dkt. No. 49 at 2–3; *see also* Dkt. No. 46 at 3 (arguing that "both officers took Sanchez to the ground, striking his face on the pavement which cut his mouth and cracked his front teeth"). Robert Deanda, another fellow inmate, submitted a declaration stating that Sanchez "made a movement" and then officers "pick[ed] him up and slam[med] him to the ground," and Deanda "saw his tooth fly out of his mouth." Dkt. No. 48 at 2; *see also* Dkt. No. 46 at 3.

This evidence precludes the Court from finding that Officer Gomez is entitled to summary judgment or qualified immunity on Sanchez's negligence claim because it creates a genuine dispute as to whether Gomez acted reasonably or breached the duty to protect inmates from harm. Although Defendants are correct that certain aspects of Deanda's and Lozano Rodriguez's testimony seem to be incorrect relative to facts the parties themselves do not dispute, *see* Dkt. No. 51 at 3–4, the Court does not make credibility determinations at this stage, *Anderson*, 477 U.S. at 255, and these shortcomings do not render the issue "so one-sided that one party must prevail as a matter of law," *id.* at 251–52. Accordingly, the Court DENIES Defendants' motion for summary judgment on Sanchez's claim of negligence against Officer Gomez and the DOC.

### III.  CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment as to Sanchez's negligence claim against Officer Gomez and the DOC and GRANTS the motion as to all of Sanchez's other claims. The Court also DISMISSES all Doe Defendants from the case. *See Drewry v. Cnty. of Riverside*, No. EDCV-20-2554-JGB (SHKx), 2023 WL 2627740, at *6

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 22

(C.D. Cal. Jan. 23, 2023) (dismissing all claims against Doe defendants where, "[d]espite ample opportunity," plaintiff failed to move "to amend the complaint to name any doe defendant," and the deadline to add parties to the complaint had passed); *Bradford v. City of Seattle*, 557 F. Supp. 2d 1189, 1207–08 (W.D. Wash. 2008) ("Because plaintiff has had the opportunity to identify the John Doe defendants but has failed to perfect claims against them, these defendants must be dismissed.").

Within 21 days of this Order, the parties are ORDERED to meet and confer and submit a proposed schedule for trial and the remaining pretrial deadlines.

Dated this 19th day of February, 2026.

Lauren King
United States District Judge

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 23